UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
IAN FELMINE,

                     Plaintiff,                                **NOT FOR PUBLICATION**
                                                       **MEMORANDUM & ORDER**
-against-                                            09-CV-3768 (CBA)(JO)

THE CITY OF NEW YORK, DETECTIVE
MARTIN RUANE, Shield No. 6170, DETECTIVE
JULIO FRANCO, Shield No. 2564, DETECTIVE
THOMAS MARKHARDT, Shield No. 6869,
SERGEANT JOSE BORRERO, Shield No. 5477,
"JOHN DOE" and "JANE DOE",

                     Defendants.
------------------------------------------------------------------x
AMON, Chief United States District Judge.

       Plaintiff Ian Felmine has filed suit pursuant to 42 U.S.C. § 1983 and § 1985 alleging

various deprivations of constitutional rights, as well as various state law causes of action.  The

plaintiff's claims arise from his arrest and prosecution for the attempted murder of Max Mazile

on October 30, 2006.  The plaintiff was arrested following statements made by Mazile to the

police, and was subsequently indicted for attempted murder on the grand jury testimony of

Mazile and another witness.  On June 10, 2009, however, the King's County District Attorney's

Office voluntarily dismissed the case, citing the fact that Mazile was uncooperative and did not

wish to proceed.  This action followed.  The defendants now move for summary judgment

asserting various defenses, including that the plaintiff's claims fail as a matter of law, are time-

barred, or that the defendants are entitled to qualified immunity.

       The plaintiff also moves to amend his complaint, principally to assert claims against

Assistant District Attorney Allana Alexander.  For the reasons stated herein, the Court grants the

defendants' summary judgment motion in part and denies it in part.  The plaintiff's motion to amend his complaint is denied in full.

## THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I.    **SUMMARY AND BACKGROUND**

On October 30, 2006, a large fight broke out in the parking lot of the Brooklyn Museum involving students from nearby Clara Barton High School.  During the incident, Max Mazile was stabbed to the left side of his upper chest. (Uzoh Decl., Ex. 10, at 155.)  Mazile was admitted to the trauma unit of the King's County Hospital Center and was discharged on November 4, 2006.

On the night of the incident, police officers including Detectives Ruane, Markhardt and Franco went to the Kings County Hospital to interview Mazile.  The parties dispute whether the officers conducted one or two interviews.  Complaint Follow Up Informationals from the night of the incident, signed by Detective Ruane, indicate that the Ruane conducted two interviews that night.  During the first interview, the reports indicate, Ruane learned that "a perp by the name of Ian stabbed the C/V in the chest believing the c/v was involved in the fight . . . The C/V states that he heard that the fight was over a Haitian flag that this perp Ian spit on last week."  (Kunz Decl., Ex. D, at 2.)  The reports state that Detective Ruane then interviewed a school safety officer at Clara Barton High School, who stated that the person who spit on the Haitian flag was named Ian Felmine.  (Id. at 3)  According to the report, Detective Ruane then conducted a check in the precinct's photo manager, and procured a photograph of seventeen-year-old Ian Felmine from a previous arrest.  (Id. at 4.)  Another Complaint Follow Up indicates that Detective Ruane re-interviewed Mazile at roughly 11:00 p.m. and showed him the photograph, at which point, "the C/V positively identified the perp as the one who stabbed him."  (Id. at 5.)

Mazile testified at his deposition that only one interview with the police occurred on the night of the incident.  During that interview, he states that he was shown a picture of Felmine and informed the officers that the individual in the photograph was in crowd that surged toward him before he was stabbed.  (Uzoh Decl., Ex. 5, at 32, 93, 96-97.)  He testified that he never told the officers that he was "stabbed in the chest by Ian," and that he wasn't aware that the fight was about a Haitian flag.  (Id. at 33-34.)  Mazile initially testified that he told the officers on the night of the incident that he saw the individual in the photograph with a slim, silver object.  (Id. at 40, 93.)  However, he later stated that he did not tell the officers about the object when they spoke that night.  (Id. at 95.)

Later that same evening, at approximately 11:30 p.m., the four defendant officers went to Felmine's apartment.  When they arrived, Felmine's mother, Estlyn Briggs, answered the door.  Ms. Briggs told the police that Felmine lived in the house, and the police then asked to see him.  In his deposition, Detective Ruane testified that Ms. Briggs then gave affirmative consent for the officers to enter.  (Uzoh Decl., Ex. 6, at 101.)  In her deposition, Ms. Briggs stated only that when the officers asked to see Felmine, she "turned [her] back, let go of [the] door" and walked to Felmine's room.  (Uzoh Decl., Ex. 8, at 36.)  Felmine was arrested at that time.

According to Felmine's version of the events, an unidentified civilian assaulted him with a two-by-four on October 30, 2006 sometime after 3:50pm, near the Brooklyn Museum.  (Uzoh Decl., Ex. 4, at 118-24.)  After the alleged assault, Felmine states he ran home and went to sleep.  (Id. at 135-37.)  He did not seek any medical treatment for his injuries at that time, and awoke when the officers arrived to arrest him.  (Id. at 215, 137.)  According to Felmine, in the course of arresting him the officers handcuffed him unnecessarily tightly and repeatedly shoved him, running him into the precinct wall and causing him to hit his head on the door to the police car.

3

(Id. at 218-221.)  He also argues that he requested medical treatment on the night of his arrest

and was denied it.  (Uzoh Decl., Ex. 4, at 183.)  At his deposition, Detective Ruane testified that

Felmine did not appear to have any injuries.  (Uzoh Decl., Ex. 6, at 107.)

Detective Ruane interrogated Felmine during the early morning hours of October 31,

2006.  It is undisputed that by this point the officers had received information that the fight at the

museum may have arisen out of a dispute where Felmine spit on a Haitian flag.  Felmine stated

to the Detective that he was involved in an incident involving a Haitian flag earlier that week;

though, he says he never mentioned anyone spitting on the flag.  (Id. at 155-56.)  According to

Felmine, he told Ruane that he was at the Brooklyn Museum on the day of the incident, and that

he was with an individual named Kareem Barrow.  (Id. at 151, 179.)  Barrow had been arrested

at the scene of the incident in possession of a knife.  According to a police report, an eyewitness

identified Barrow as the attacker of a second victim who had been cut in the face during the

altercation.  (Kunz Decl., Ex. B.)[1]

Later that day, Detective Ruane was interviewed by the Kings County District Attorney's

Early Case Assessment Bureau and signed a felony complaint against Felmine, which charged

him with attempted murder and other offenses.  Felmine was taken to Central Booking, met with

an attorney, and appeared for his initial arraignment where bail was set and a grand jury date was

scheduled for a few days later.  In the early morning hours of November 1, 2006, Felmine was

taken to the emergency department of Long Island College Hospital, where he was diagnosed

with a contusion to his right elbow and abrasions on his right forehead. (Uzoh Decl., Ex. 15, at 3-

4.)  He then was sent back to the precinct to sleep until a bus could transport him to Rikers

Island.

[1] On December 11, 2008, Assistant District Attorney Allana Alexander informed the Supreme Court, Kings County, that when tested for DNA analysis, the blood on the knife found on Kareem Barrow did not match that of the second victim. (Uzoh Decl., Ex. 16, at 2.)

Assistant District Attorney Allana Alexander spoke directly to the victim, Max Mazile, just days after the incident and took video testimony that she presented to the grand jury on November 3, 2006.  Mazile testified at his deposition that the ADA did not prepare him for his testimony in any way, but simply came to the hospital, set up the video recorder, and asked Mazile questions about what happened.  (Uzoh Decl., Ex. 5, at 17,48.)  In Mazile's grand jury testimony he stated that he saw Felmine as part of a group that chased him, and that he saw Felmine swinging a slim, silver object at his back.  (Uzoh Decl, Ex. 13, at14-15.)  The only other witness who testified against Felmine was a civilian witness named Wilguens Dorval.  Dorval told the grand jury that he saw Felmine chasing Mazile with a screwdriver, and then join a group in kicking and punching Mazile.  (Uzoh Decl, Ex. 21, at 16.)  None of the defendant officers testified before the grand jury.

Prior to recording Mazile's grand jury testimony, ADA Alexander spoke with Dorval at the hospital and discovered that he had been an eyewitness to the fights at the museum.  (Uzoh Decl., Ex. 7, at 29-39.)  It is disputed exactly what was said between the two of them, but Dorval testified in his deposition that the ADA put pressure on him and his friends to give her information about Felmine by telling them that Felmine was dangerous and could hurt someone else.  (Uzoh Decl., Ex. 9, at 39-40.)  Dorval then agreed to testify the next day before the grand jury. He stated in his deposition that when he met to prepare with ADA Alexander immediately before giving his grand jury testimony, she told him to say he saw Felmine with a screwdriver, even though Dorval claims he only heard this fact secondhand from others at the hospital.  (Id. at 53-55.)  Dorval does not dispute that he was present at the incident and saw Felmine participating in the fighting.

On November 3, 2006, the Grand Jury indicted Felmine on charges including attempted murder, assault, and criminal possession of a weapon.  (Uzoh Decl., Ex. 35.)  On June 10, 2009, the Kings County District Attorney's Office moved to dismiss the charges against Felmine due to lack of cooperation on the part of the witnesses.  (Uzoh Decl., Ex. 20.)

## II.      STANDARD OF REVIEW

Defendants move for summary judgment, seeking dismissal of the complaint in full. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 23 (1986); Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999).  The Court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of fact to be tried.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not that of a judge."  Id. at 255; see also Fischl v. Armitage, 128 F.3d 50,55 (2d Cir. 1997) ("[C]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").

The court is required to view the evidence in the light most favorable to the nonmoving party.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Nevertheless, the non-moving party cannot rest on mere allegations or denials but must instead set forth specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); Nat'l Westminster Bank USA v. Ross, 676 F. Supp. 48, 51 (S.D.N.Y. 1987) ("[S]peculation, conclusory allegations, and mere

denials are not enough to raise genuine issues of fact.").  A motion for summary judgment requires the party bearing the burden of proof at trial "to make a showing sufficient to establish the existence of an element essential to that party's case . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-23.  No genuine issue exists unless there is sufficient evidence favoring the nonmoving party for a rational trier of fact to find for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).

In order to maintain an action pursuant to § 1983, a plaintiff must allege two essential elements.  First, "the conduct complained of must have been committed by a person acting under color of state law."  Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994).  Second, "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States."  Id. "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993) (citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985)).

## III.   THE INDIVIDUAL DEFENDANTS

### A.   The Statute of Limitations as to Defendants Markhardt and Borrero

The defense argues that because the plaintiff failed to amend his complaint to name defendants Markhardt and Borrero before the expiration of the statute of limitations, claims against those defendants must be dismissed.  The plaintiff does not dispute that the claims against these two defendants would be otherwise time-barred, but argues only that the defendants

7

are equitably estopped from asserting a statute of limitation defense, because the defendants were aware of the officers' names and prevented the plaintiff from obtaining them in time to amend his complaint before the limitations period expired.

Claims under § 1983 are governed by the statute of limitations and tolling rules provided by the analogous state law. Board of Regents v. Tomanio, 446 U.S. 478, 483-92 (1980). In New York, the applicable statute of limitations is three years. Soto v. Brooklyn Corr. Facility, 80 F.3d 34, 35 (2d Cir. 1996); see N.Y. C.P.L.R. § 214(5). The statute of limitations accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." Singleton v. City of New York, 632 F.2d 185, 191 (2d Cir. 1980). However, because the plaintiff was seventeen at the time of his arrest, the statute of limitations for claims accruing during that event was "tolled" until his eighteenth birthday on December 9, 2006. See N.Y. C.P.L.R. § 208. The limitations period for these claims therefore expired on December 9, 2009. The plaintiff's claim for malicious prosecution did not begin to accrue until the date of favorable termination of the criminal proceedings—June 10, 2009—and so the limitations period will not expire until June 10, 2012. See Heck v. Humphrey, 512 U.S. 477, 489-90 (1994). The plaintiff's Second Amended Complaint was filed on January 18, 2010 and was the first pleading to add Markhardt and Borrero as defendants. (Uzoh Decl., Ex. 1.) The issue is thus whether equitable estoppel prevents defendants Markhardt and Borrero from raising the statute of limitations for all claims other than malicious prosecution.

A defendant may be equitably estopped from asserting the statute of limitations as a defense "in cases where the plaintiff knew of the existence of his cause of action but the defendant's conduct caused [the plaintiff] to delay in bringing his lawsuit." Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 50 (2d Cir.1985); see also Keating v. Carey, 706

F.2d 377, 382 (2d Cir.1983). "To invoke equitable estoppel, a plaintiff must show that: (1) the defendant made a definite misrepresentation of fact, and had reason to believe that the plaintiff would rely on it; and (2) the plaintiff reasonably relied on that misrepresentation to his detriment." Buttry v. General Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) (citing Heckler v. Cmty. Health Servs., 467 U.S. 51, 59 (1984)). A concealment of material facts is a sufficient "misrepresentation" to satisfy the first prong of the test. Smith v. Smith, 830 F.2d 11, 13 (2d Cir. 1987).

On September 24, 2009, Magistrate Judge Orenstein ordered the defendants to identify the police officers "involved in the arrest at issue in this litigation" no later than October 23, 2009. (Uzoh Decl., Ex. 46.) A letter from defense counsel to the plaintiff's counsel, dated October 2, 2009, contained only the name of Detective Ruane, and stated that the City was not able to identify any other individuals who had been involved in the arrest at that time. (Uzoh Decl., Ex. 48.) On October 8, 2009, the plaintiff's counsel notified defense counsel that his client knew that there were multiple officers involved in the arrest and was seeking the additional names. (Uzoh Decl., Ex. 49.) It is unclear whether defense counsel ever responded to this request. The plaintiff claims he received the police reports from his arrest on October 21, 2009. These reports revealed the involvement of Detective Franco, who was timely added to the complaint.[2] (Pl. 56.1 Stmt. at ¶ 164.) In an email dated December 17, 2009, the plaintiff's counsel again inquired for additional officers' names and was told by defense counsel that they would be produced as quickly as possible. (Uzoh Decl., Ex. 52.) This communication took place, of course, after the limitations period had already expired. Defense counsel produced the names of all four officers in a letter dated January 13, 2010. (Uzoh Decl., Ex. 53.) The

---

[2] While Detective Markhardt's name also appears in the police reports that plaintiff admits to have possessed by October 21, 2009, the report only states that Markhardt ran a background check on the victim Max Mazile, and does not indicate that he was involved in the plaintiff's arrest. (Uzoh Decl., Ex. 50)

defendants maintain that they failed to undertake efforts to produce the additional names earlier because the plaintiff's complaint only named one "John Doe" officer as a defendant, and the City was therefore under the impression that the plaintiff was only suing Detective Ruane.

On these facts, the plaintiff fails to make the requisite showing for equitable estoppel.  In particular, the plaintiff makes no showing that he relied to his detriment, prior to the December 9, 2009 expiration date, on any statement or omission made by defense counsel.  The above communications make clear that the plaintiff was long aware that multiple officers were involved in his arrest, and that he was never dissuaded from his belief that additional names needed to be produced.  Thus, it does not appear that the plaintiff was deceived or misled in any way into failing to add the additional defendants.  Once defense counsel failed to produce names beyond Detective Ruane's, the plaintiff at all times had the option of moving this Court to compel the disclosures and to address any misunderstandings between the parties regarding who the plaintiff was seeking to sue.  By filing his action so close to the end of the limitations period, the plaintiff assumed the common risk of discovery delays, and should have taken more proactive measures to prevent his claims from lapsing.  Instead, he did not revive the matter with the defendants until after the limitations period had expired.

For the reasons stated, the Court grants summary judgment to Detectives Markhardt and Borrero on the grounds of the statute of limitations for all claims other than malicious prosecution.[3]

---

[3] Plaintiff does not argue that the addition of Markhardt and Borrero should "relate back" to the naming of a single "John Doe" in the original complaint, due to his lack of knowledge as to the officer's identities.  Indeed, the plaintiff's Second Amended Complaint names Markhardt and Borrero but retains the "John Doe" defendant as well. It should be observed regardless that the Second Circuit has held that substituting individual officers for "John Doe" defendants after the expiration of the statute of limitations does not "relate back" under Rule 15(c) of the Federal Rules of Civil Procedure when the initial failure was due to lack of knowledge.  Barrow v. Wethersfield Police Dep't, 66 F.3d 466, 470 (2d Cir.1996) ("Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly-added defendants were not named originally because the plaintiff did not know their identities.").  Though one district court in this circuit has allowed such an amendment when the plaintiff made

**B.**     **False Arrest**

A § 1983 claim for false arrest or false imprisonment, based on an individual's right to be free from unreasonable seizures, is substantially the same as a claim for false arrest under New York law.  Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003).  Such a claim requires the plaintiff to show (1) that the defendant intended to confine the plaintiff; (2) that the plaintiff was conscious of the confinement; (3) that the plaintiff did not consent to the confinement; and (4) that the confinement was not otherwise privileged. Savino v. City of New York, 331 F.3d 63, 75 (2d Cir.2003).  Even where a plaintiff proves all of the required elements, the claim will nevertheless fail where there was probable cause for the arrest.  Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir.2006) ("[T]he existence of probable cause is an absolute defense to a false arrest claim."); Caldarola v. Calabrese, 298 F.3d 156, 161 (2d Cir.2002); see also Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). Here, the defense argues that no claim for false arrest may lie against the arresting officers because the undisputed facts establish that there was probable cause.

Probable cause requires an officer to have "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir.2000) (citation omitted).   "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."

---

diligent attempts to identify the individual within the limitations period but was denied the information by the defendants, see Byrd v. Abate, 964 F. Supp. 140, 145-46 (S.D.N.Y. 2007), the plaintiff here would nonetheless face difficulties under this theory since he has only ever named one "John Doe," despite his personal knowledge of the facts giving rise to the claim and his counsel's own admission that he knew there were multiple officers involved in the arrest.  (See Uzoh Decl., Ex. 49.)  At any rate, the Court need not resolve these issues, as the plaintiff only raises the equitable estoppel argument.

Devenpeck v. Alford, 543 U.S. 146, 152 (2004) (emphasis added); accord Ricciuti v. New York

City Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997).  Probable cause is to be analyzed from

an objective perspective, in light of the "totality of the circumstances." Panetta v. Crowley, 460

F.3d 388, 395 (2d Cir.2006).  Therefore, the state of mind of the arresting officer is irrelevant to

the probable cause determination; "[t]hat is to say, his subjective reason for making the arrest

need not be the criminal offense as to which the known facts provide probable cause."

Devenpeck, 543 U.S. at 153; see Jaegly, 439 F.3d at 153 (noting that the Supreme Court has

"rejected the view that probable cause to arrest must be predicated upon the offense invoked by

the arresting officer, or even upon an offense 'closely related' to the offense invoked by the

arresting officer").  Thus, in the instant case, the plaintiff's claim of false arrest must fail if, at the

time of the arrest, the defendant officers had probable cause to arrest the plaintiff for any crime.

 The defendants argue that probable cause was established during the officers' interview

with Max Mazile prior to the plaintiff's arrest.  The defendants urge that that the undisputed facts

to be taken from the interview, even if insufficient to create probable cause for attempted

murder, would establish probable cause to arrest for several crimes under New York law,

including N.Y.P.L. § 120.15 "Menacing in the third degree," N.Y.P.L. § 120.06 "Gang assault in

the first degree," and N.Y.P.L. §120.10 "Attempted assault."

"[I]t is well-established that a law enforcement official has probable cause to arrest if he

received his information from some person, normally the putative victim or eyewitness, unless

the circumstances raise doubt as to the person's veracity."  Panetta, 460 F.3d at 395 (citations and

internal quotation marks omitted); see also Singer, 63 F.3d at 119 ("An arresting officer advised

of a crime by a person who claims to be the victim . . . has probable cause to effect an arrest

absent circumstances that raise doubts as to the victim's veracity".).  The veracity of those

individuals "who are the victims of the very crime they report to the police is assumed."

Miloslavsky v. AES Engineering Soc., Inc., 808 F. Supp. 351, 355 (S.D.N.Y.1992), aff'd, 993

F.2d 1534 (2d Cir.1993); see also Martinez, 202 F.3d at 634; Parisi v. Suffolk County, 2009 WL

4405488, at *7 (E.D.N.Y. 2009) ("[T]he probable cause standard does not require that the

arresting officer affirmatively seek out reasons to doubt the victim or witness where none are

apparent.").  In addition, a photo identification of the suspect by an eye witness "is normally

sufficient to establish probable cause." Celestin v. City of New York, 581 F. Supp. 2d 420, 431

(E.D.N.Y. 2008).  However, in making that determination, a court will consider the reliability of

the identification, including the corroborating circumstances and whether there was reason to

question the veracity of the witness.  See Thompson v. City of New York, 603 F. Supp. 2d 650,

657 (S.D.N.Y. 2009) (noting that circumstances may exist "where a victim's identification was

so unreliable as to not establish probable cause"); Oliveira v. Mayer, 23 F.3d 642 (2d Cir. 1994)

("[E]ven if bystander witnesses are considered presumptively reliable, a report of a crime alone

will not necessarily establish probable cause.").

      Reading the record in the light most favorable to the plaintiff, the Court finds that there

remain many disputed issues of material fact as to the existence of probable cause to arrest.  It

seems that the only fact on which the parties agree is that Mazile identified to the police a picture

of Felmine as a person who was present at the scene of the stabbing.  In his deposition, Mazile's

account of his conversation with the police contains a great degree of ambiguity and seeming

contradiction.  In many instances, it is unclear whether Mazile is recounting what he told police

about the incident prior to the plaintiff's arrest, or whether he is stating what actually took place

at the Brooklyn Museum, but that he might not have told police at the hospital.  Thus, at times,

Mazile appears to testify that he told the officers that Felmine was in a crowd of individuals that

came towards him, causing him to attempt to defend himself and then to run away. (Uzoh Decl., Ex. 5, at 68-71, 92-93.)  Later, however, Mazile states that in his only conversation with the police, "[the officer] brought a picture and I told them I did see Ian there.  That was it."  (Id. at 96-97.)  The Mazile deposition is also contradictory with respect to whether he told police that Felmine was carrying an object.  Initially, Mazile testified that he told the officers he saw Felmine at the altercation with an object in his hand.  (Id. 40-41.)  Later in the same deposition, though, Mazile testified that while he did see Felmine with a silver object in his hand, he didn't think he told the defendants this information at the hospital because "it didn't come up."  (Id. 93-97.)

Detective Ruane's account of the evening is much different from Mazile's.  Ruane, in both his deposition and his police reports, stated that Mazile told him at the hospital that he was stabbed by a person named Ian over a dispute involving a Haitian flag.  (Uzoh Decl, Ex. 6, at 135-139; Kunz Decl., Exhibit E, No. 2.)  However, Mazile testified that he never told police that he was stabbed by the person in the photograph, and that he can't remember if he gave the officers the name Ian.  (Uzoh Decl., Ex. 5, at 32-33.)  He also testified that he has never given the identity of the person who stabbed him because he does not know.  (Id. at 42.)  Additionally, he testified that he never told the officers at the hospital anything about a Haitian flag, and wasn't aware of such a dispute.  (Id. at 34.)

Where there is a dispute as to the facts and events giving rise to probable cause, the question is properly left to the jury.  See Murphy v. Lynn, 118 F.3d 938, 947 (2d Cir. 1997) ("[W]here the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is dispute as to the pertinent events, the existence vel non of probable cause is to be decided by the jury."); Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir.

1994) (holding that since the issue of probable cause was predominantly factual in nature, it was properly presented to the jury.)  On the record before the Court, it remains difficult to discern what information was told to the defendants prior to the plaintiff's arrest.  If, according to the plaintiff's contention, Mazile only told police officers that Felmine was present at the incident, and nothing more, this would not have amounted to probable cause for any arrest.  See United States v. Almanzar, 749 F. Supp. 538, 540 (SDNY 1990) ("[M]ere association with a known or suspected criminal or presence at the scene of a crime does not create probable cause.") (citing United States v. Di Re, 332 U.S. 581, 593 (1948)).  Given Mazile's testimony that he did not tell the officers about any dispute involving a Haitian flag, thereby contradicting Detective Ruane's police reports, it is similarly difficult to discern how and when the officers obtained this information and used it to link Felmine to the stabbing incident.  The conflicting accounts provided by Ruane and Mazile, as well as the seeming inconsistencies and confusion within Mazile's deposition itself, leave many disputed issues as to the reliability and credibility of anyone's account of the events.  These issues are for a jury to decide.  See Anderson, 477 U.S. at 255.

The defendants argue that even if probable cause was lacking, they should nonetheless be entitled to qualified immunity. Qualified immunity protects officials from civil damages liability where "(1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." Holcomb v. Lykens, 337 F.3d 217, 220 (2d Cir. 2003) (quoting Weyant v. Okst, 101 F.3d 845, 857 (2d Cir. 1996)). Because here, the right not to be arrested without probable cause was clearly established, the only question is whether it was objectively reasonable for the defendants to believe their conduct did not violate that right.  A police officer has acted in an unreasonable manner where

"no officer of reasonable competence could have made the same choice in similar circumstances." Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir. 1997). That is, officers are entitled to qualified immunity if "officers of reasonable competence could disagree" as to legality of their action. Malley v. Briggs, 475 U.S. 335, 341 (1986).

To that end, the doctrine of qualified immunity protects an officer from a § 1983 suit for false arrest where there was "arguable" probable cause for the arrest. See Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007). "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (quoting Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991)). However, while qualified immunity provides this broader protection from liability, "'[a]rguable' probable cause must not be misunderstood to mean 'almost' probable cause." Zellner, 494 F.3d at 370 (quotations omitted). Thus, the Second Circuit has explained, "[i]f officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer." Jenkins v. City of New York, 478 F.3d 76, 87 (2d Cir. 2007).

A claim that it was objectively reasonable for an official to believe that his actions did not violate a clearly established right "has its principal focus on the particular facts of the case." Hurlman v. Rice, 927 F.2d 74, 78-79 (2d Cir.1991); see Kerman v. City of New York, 374 F.3d 93, 109 (2d Cir. 2004). Summary judgment should therefore not be granted on the basis of qualified immunity unless the defendant can show that "no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Ford v. Moore, 237 F.3d 156, 162

(2d Cir.2001).  Where there is no dispute as to the material facts, the matter of whether the defendants' conduct was objectively reasonable in a question of law for the court.  Zellner, 494 F.3d at 368.  If there is such a factual dispute, however, "the factual questions must be resolved by the factfinder."  Kerman, 374 F.3d at 109; see also Thomas v. Roach, 165 F.3d 137, 143 (2d Cir.1999) ("Summary judgment on qualified immunity grounds is not appropriate where there are facts in dispute that are material to a determination of reasonableness."); Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995).

In this case, most of the material facts leading up to the arrest are in dispute.  It is impossible to discern an account that is sufficiently uncontroverted to establish as a matter of law that there was any degree of probable cause—"arguable" or otherwise.  Felmine's version of the events is that the officers arrested him after receiving information that he was present at the chaotic scene of the fight, but no more.  Officers of reasonable competence would have to agree that this did not amount to probable cause to arrest the plaintiff for a crime.  Faced with so little in the way of undisputed facts, and reading the evidence in the light most favorable to the plaintiff, the Court cannot conclude as a matter of law that the defendants' actions were objectively reasonable under clearly established Fourth Amendment principles.

Accordingly, as to defendants Ruane and Franco, summary judgment on the claim for false arrest is denied.

## C.    Malicious Prosecution

Like a claim of false arrest, the elements of a malicious prosecution claim pursuant to 42 U.S.C. § 1983 are drawn from state law.  Boyd v. City of New York, 336 F.3d 72, 75 (2d Cir. 2003); Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003).  Under New York law, to succeed on a claim of malicious prosecution, the plaintiff must prove four elements: (1) the defendant

17

initiated or continued a criminal proceeding; (2) the proceeding terminated favorably to the

plaintiff, (3) there was no probable cause for the criminal charge; and (4) the defendant acted

maliciously.  Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004); Savino v. City of New

York, 331 F.3d 63, 72 (2d Cir. 2003).  While the plaintiff has presented sufficient evidence that

Detective Ruane meets the first element, the plaintiff fails to survive summary judgment on the

third and fourth.

**1.      Initiation of prosecution**

The defendants claim that the officers did not initiate a prosecution against the plaintiff.

Rather, they argue, the officers did nothing more than disclose to the district attorney's office all

material information within their knowledge, and the ADA made the decision to prosecute

independent of any pressure from the officers.

To prevail on a malicious prosecution claim, a plaintiff must show that the defendant

"played an active role in the prosecution, such as giving advice and encouragement or

importuning the authorities to act."  Manganiello, 612 F.3d 149,163 (2d Cir. 2010).  Where the

claim is directed at the police, "a malicious-prosecution claim cannot stand if the decision made

by the prosecutor to bring criminal charges was independent of any pressure exerted by [the]

police."  Hartman v. Moore, 547 U.S. 250, 263 (2006).  However, in malicious prosecution

claims brought against police officers, plaintiffs have succeeded in demonstrating that the

officers initiated criminal proceedings by having the plaintiff arraigned, by filling out

complaining and corroborating affidavits, or by signing felony complaints.  Llerando-Phipps v.

City of New York, 390 F. Supp. 2d 372, 383 (S.D.N.Y.2005); see Cameron v. City of New York,

598 F.3d 50, 63 (2d Cir. 2010) ("Under New York law, police officers can 'initiate' prosecution

by filing charges or other accusatory instruments."); Cox v. County of Suffolk, 827 F. Supp. 935

18

935, 938 (E.D.N.Y. 1993) (holding that in swearing to and signing the felony compliant, the officer was sufficiently involved in the initiation of the criminal proceeding for a malicious prosecution claim).

Here, it is undisputed that Detective Ruane was interviewed by the DA's Early Case Assessment Bureau and signed the sworn criminal court complaint. (Kunz Decl., Ex. G.) As to Ruane, this fact is sufficient to survive summary judgment on this factor. However, the plaintiff does not point to any facts indicating that the other officers participated in the initiation of formal criminal proceedings. (Pl. 56.1 Stmt. at ¶¶ 111-24.) Ruane's deposition establishes that the other officers assisted to varying degrees in the investigation, witness interviews, and the arrest itself, but that Ruane was the only one "assigned" to the case and was the one responsible for providing documents and information to the DA's office. (Uzoh Decl., Ex. 6, at 110, 191-93.) Moreover, it is now undisputed that none of the defendant officers testified at the grand jury. (Defs. 56.1 Stmt. at ¶ 41.) The plaintiff has therefore not produced sufficient facts from which a jury could find that the defendants other than Ruane "played an active role in the prosecution" within the meaning of a malicious prosecution claim.

For the above reasons, summary judgment is granted in favor of defendants Franco, Markhardt and Borrero on the malicious prosecution claim.

**2.      Probable cause to prosecute**

As with a false arrest claim, the existence of probable cause is a complete defense to a claim of malicious prosecution. Savino, 331 F.3d at 72. Moreover, "[o]nce a suspect has been indicted . . . the law holds that the Grand Jury action creates a presumption of probable cause." Rothstein v. Carriere, 373 F.3d 275, 282-83 (2d Cir. 2004); see Green v. Montgomery, 219 F.3d 52, 60 (2d Cir. 2000) (citing Marshall v. Sullivan, 105 F.3d 47, 50 (2d Cir. 1996)). That

presumption may only be rebutted "by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Savino, 331 F.3d at 72 (quotations omitted) (emphasis added). "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." Id. at 73. This burden "requires the plaintiff to establish what occurred in the Grand Jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the premise that the Grand Jury acts judicially." Rothstein, 373 F.3d at 284. The plaintiff may not satisfy his burden "with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." Savino, 331 F.3d at 73.

The plaintiff argues that because the indictment was eventually dismissed, that dismissal negates the presumption of probable cause, citing Cox v. County of Suffolk, 827 F. Supp. 935, 939 (E.D.N.Y. 1993). In Cox, however, the district court held only that "where a grand jury indictment is reviewed by a state judge and dismissed due to total lack of evidence . . . the presumption of probable cause raised by that indictment will fail." Id. at 939. Here, the dismissal of the case against Felmine did not pertain to the evidence adduced at the grand jury, but rather resulted from the ADA's voluntary motion to dismiss due the difficulty of ascertaining trial testimony from the victim. (Uzoh Decl., Ex. 19.)

The plaintiff further argues that the presumption of probable cause may be overcome where, as here, a plaintiff alleges that the police provided false statements to the prosecutor. In his Rule 56.1 Statement, Felmine alleges that the false statements consisted of telling the ADA that Mazile and Felmine were fighting during the incident, and that Felmine had a "sharp shiny object and stabbed [Mazile] in the chest." (Pl. 56.1 Stmt. at ¶ 111.) There are similar statements contained in Ruane's criminal complaint. (Uzoh Decl., Ex. G.)

20

Where a prosecution follows from a grand jury indictment, however, the police officer accused of malicious prosecution typically must have engaged in some misconduct that had a material effect on that indictment.  See, e.g., Manganiello, 612 F.3d at 162 (presumption of probable cause was rebutted where police officer defendant, inter alia, promoted a grand jury witness to the ADA despite knowing he had already lied about the plaintiff's involvement in the crime); Savino, 331 F.3d at 73 (in order to survive a motion for summary judgment on malicious prosecution claim against police officer defendants, "[the plaintiff] must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith" (emphasis added)).  Conversely, where the grand jury indictment is procured without any involvement of the alleged falsehoods, those falsehoods cannot be considered a proximate cause of the resulting prosecution.  Richardson v. City of New York, 2006 WL 2792768, at *7 & n.4 (E.D.N.Y. 2006) (noting that in a malicious prosecution claim "[t]he alleged fabrication must be both material, i.e., 'likely to influence a jury's decision,' and 'the legally cognizable' cause of the post-arraignment deprivation of liberty.")  (quoting Ricciuti, 124 F.3d at 130; Zahrey v. Coffey, 221 F.3d 342, 350 (2d Cir. 2000)).

Therefore, even taking as true Felmine's claim that Detective Ruane embellished what Mazile had told him about the stabbing, this allegation does not serve to rebut the presumption of probable cause created by the grand jury indictment, because there is no evidence that Detective Ruane exerted any influence whatsoever over what took place before the grand jury.   It is undisputed that the only two witnesses presented against Felmine were Mazile and Wilguens Dorval, both of whom the prosecutor interviewed on her own.  ADA Alexander testified in her deposition that she could not remember speaking to the police prior to the indictment, and that after speaking with Mazile herself, she made "a determination that [she] didn't need the officers'

testimony to present the evidence to the Grand Jury." (Id. at 50.)[4]  None of Ruane's alleged

misrepresentations were ever integrated into the prosecution's case.

The plaintiff seeks to show that the grand jury proceedings were corrupted by pointing to

Wilguens Dorval's deposition, which contains testimony that can be read to indicate that ADA

Alexander told him to testify to facts that he did not personally observe but had only heard from

others who had also been present at the incident.  (Uzoh Decl., Ex. 9, at 52-55.)  A discussion of

this evidence is taken up further as it relates to plaintiff's motion to add ADA Alexander as a

defendant, infra.  For current purposes, it must be observed that there is no claim that Detective

Ruane had any involvement in the procuring of Dorval's testimony—to the contrary, it is

undisputed that ADA Alexander was the only person who knew Dorval was a witness prior to

the grand jury.  (Uzoh Decl., Ex. 7, at 62.).

Furthermore, even setting aside Dorval's grand jury testimony, Max Mazile's undisputed

account of the incident was alone sufficient to create probable cause for the ensuing indictment.

See Bakowski v. Kurimai, 387 Fed. App'x 10, 12 (2d. Cir. 2003) (rejecting malicious

prosecution claim because "the evidence presented to the grand jury, independent of [the

challenged] testimony . . . was sufficient to establish probable cause to indict").  In Mazile's

grand jury testimony, he stated that he saw Felmine as part of a group that chased him, and that

Felmine was repeatedly swinging a long, slim silver object at his back.  (Uzoh Decl, Ex. 13,

at14-15.)  He also stated that he fell and the pursuers began kicking him, shortly before he

---

[4] The plaintiff cites to Cameron v. City of New York, 598 F.3d 50, 63-65 (2d Cir. 2010), seemingly for the proposition that the subsequent acts of the prosecutor and grand jury have *no* bearing on the liability of a police officer who allegedly provides false information to the ADA.  However, the criminal case at issue in Cameron was never presented to a grand jury, but rather was a misdemeanor tried only on the basis of the felony complaint sworn to by the defendant officer.  Id. at 57 (describing the post-arrest events).  Thus, the Cameron court did not confront the argument that a presumption of probable cause should be given to the indictment, and did not deal with a case where the alleged falsehoods were wholly independent from the direct witness testimony offered before the grand jury issuing that indictment.

realized he had been stabbed.  (Id. at 15-20.)  He has never denied the truthfulness of this

testimony.   Rather, he confirmed in his deposition that his grand jury testimony was not

"procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in

bad faith."  Savino, 331 F.3d at 72 (quotations omitted).   Indeed, the most that can be said of the

alleged defect in Dorval's testimony is that he did not reveal that other people claimed to have

seen Felmine carrying a screwdriver, but he did not personally observe it.  (Uzoh Decl., Ex. 9, at

53-55.)  He does not dispute seeing Felmine in the group that was fighting and kicking the

victim, and he never alleges that the ADA told him to embellish his version of those events.  (Id.

at 47-53; Ex. 21, at 13.)  Even crediting the plaintiff's claims about Dorval's lack of personal

knowledge as to the screwdriver, he has failed to present sufficient evidence that the grand jury

proceedings were so "tainted" with false evidence that the resulting indictment lacked probable

cause.  Rothstein, 373 F.3d at 285.

Finally, it is undisputed that immediately following his arrest, the plaintiff admitted to

Detective Ruane during interrogation that he had been in a fight that day at the Brooklyn

Museum, that he was with Kareem Barrow at the time, and that he had been involved in a dispute

the prior week involving a Haitian flag.  (Uzoh Decl., Ex. 4, at 151-55, 179.)  By that point,

Kareem Barrow had been arrested in possession of a knife and had been identified by an

eyewitness as the perpetrator of a second assault.  The police had also received information that

the fights were motivated by the earlier dispute over the flag.  In light of these admissions,

coupled with Mazile's account of the events, no reasonable jury could conclude that the

prosecution lacked probable cause.

**3.      Malice**

Defendants further argue that there is no evidence in the record of actual malice. In the context of a malicious prosecution claim, malice consists of "'a wrong or improper motive, something other than a desire to see the ends of justice served.'" Lowth v. Town of Cheektowaga, 82 F.3d 563, 573 (2d Cir.1996) (quoting Nardelli v. Stamberg, 44 N.Y.2d 500, 503 (1978)). Furthermore, "while lack of probable cause to institute a criminal proceeding and proof of actual malice are independent and indispensable elements of a malicious prosecution action, the absence of probable cause does bear on the malice issue." Blake v. Race, 487 F. Supp. 2d 187 (E.D.N.Y. 2007) (quotations and citations omitted). To that end, even if a plaintiff makes no direct showing of malice, "lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment." Ricciuti, 124 F.3d at 131.

The plaintiff's arguments regarding malice do nothing more than recite legal standards, and he points to no facts in the record indicating that Detective Ruane acted with an invidious motive. Moreover, since this Court has already found that there was probable cause for the prosecution, malice may not be inferred on that basis.

For the foregoing reasons, summary judgment in favor of the defendants is granted with respect to the plaintiff's claim of malicious prosecution.

## D.    Right to a Fair Trial

The plaintiff also makes a claim that he was denied his right to a fair trial based on Detective Ruane's allegedly false assertions to the DA's office about what Mazile told him took place during the stabbing. Both parties concede that the plaintiff has a constitutional right not "to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty." Zahrey, 221 F.3d at 344. Stated another way,

24

"when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." Ricciuti, 124 F.3d at 130. This type of §1983 claim bears many similarities to the plaintiff's claim for malicious prosecution, and thus a similar disposition is appropriate. See Richardson, 2006 WL 2792768, at *7 (noting that the difference between a malicious prosecution claim and "a free-standing claim for fabrication of evidence or denial of a fair trial, is a matter of some doctrinal ambiguity").

As in the causal inquiry of a malicious prosecution claim, cases dealing with the alleged fabrication of evidence as a denial of the right to a fair trial have focused on the use or foreseeable use of the false information in the grand jury or at trial. See Zahrey, 221 F.3d at 345-46 (defendant alleged to have improperly influenced and coerced the grand jury testimony that resulted in indictment and trial); Ricciuti, 124 F.3d at 130 (jury could find that the defendants "violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict"); Wray v. City of New York, 490 F.3d 189, 192-95 (2007) (officer-defendant not liable under § 1983 for violating right to a fair trial based on trial judge's decision to admit unduly suggestive show-up identification at trial). Allegedly false statements that played no part in the course of the prosecution cannot be said to have corrupted the fairness of the state's case against the accused.

Here, the plaintiff points to no evidence in the record indicating that any of the allegedly false conclusions concerning his involvement in the stabbing were to be used at trial; rather, the ADA has always maintained that the state's case proceeded on the basis of Mazile's firsthand

25

account of the events.  As discussed above, the indictment was also obtained independently from any representations made by the police.  There is thus no factual basis from which a jury could infer that the defendants "misled or pressured the prosecution or trial judge" in any way that could have deprived the plaintiff of a fair trial.  Wray, 490 F.3d at 193.

Summary judgment is thus granted to the defendants on the fair trial claim.

## E.    Unlawful Entry

The plaintiff claims that the defendants violated his Fourth Amendment rights by entering his residence without a warrant, and thus are liable under § 1983.  The defendants argue that the plaintiff cannot maintain a claim for unlawful entry because Ms. Briggs, the plaintiff's mother, consented to the entry.  The plaintiff contends that consent was not in fact given by Ms. Briggs.

A warrantless entry into a house is presumptively unconstitutional.  Payton v. New York, 445 U.S. 573, 586 (1980).  One well-established exception to this presumption exists where consent is given to the entry by a person who possesses common authority over the premises.  Illinois v. Rodriguez, 497 U.S. 177, 181 (1990).  "Consent can be found from an individual's words, acts or conduct."  Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988).  Because the Fourth Amendment only prohibits objectively unreasonable searches, in the context of a purported consent to search the "ultimate question" is whether, based on the totality of the circumstances, "the officer had a reasonable basis for believing that there had been consent to the search." United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995) (quoting United States v. Sanchez, 32 F.3d 1330, 1334-35 (8th Cir. 1994) (collecting cases)).[5]  "Consent must be a product of that

---

[5] Although in a criminal case, the government bears the burden of proving consent, Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973), "the law of this Circuit is not clear in assigning the burden of proof regarding consent in a § 1983 action."  Tirreno v. Mott, 375 Fed. App'x 140, 142 (2d Cir. 2010).  This Court need not decide the burden issue here, as it finds that, regardless, there remains a genuine issue of material fact precluding the grant of summary judgment

individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993) (quoting Schneckloth, 412 U.S. at 227) (internal citations omitted).

The plaintiff does not claim that his mother lacked authority to consent to the entry, so the issue turns on whether consent was in fact given. In Detective Ruane's deposition, he testified that he asked Ms. Briggs for permission to enter the apartment and was given express, verbal consent (Uzoh Decl., Ex. 6, at 88). In Ms. Briggs' own deposition, she testified that:

> [The arresting officers] asked me if I have a son named Ian Felmine, and I said yes. They said, where is he? I said, he's inside. And they said they would like to see him. So I turned my back, let go of my door, walked into the room and they were behind me.

(Uzoh Decl., Ex. 8, at 36.) A sworn affidavit signed by Ms. Briggs, taken the month before her deposition, states "I told [the police] that I would check to find out whether he was at home, and then closed my door. As I closed the door and started walking towards my son's bedroom, I heard the door open and I saw the two gentleman . . . following me." (Uzoh Decl., Ex. 14, at ¶¶ 5-6.)

The case law regarding when non-verbal actions constitute valid consent is murky. One Second Circuit case found consent where a defendant "advised the officers that his identification was inside the house and entered for the purpose of showing them his identification." United States v. Deutsch, 987 F.2d 878, 883 (2d Cir.1993). However, the district court's finding, upheld in Deutsch, was made following a full suppression hearing in a criminal case, and the court based its decision on far more testimony than the record contains here. Id. at 881-82. Other non-verbal consent cases appear to contain more affirmatively welcoming physical actions by the person giving consent than those presented in this case. See United States v. Flores, 48 F.3d 467, 468-69 (10th Cir. 1995) (after giving valid consent to one search, the defendant re-consented to a

second search of her car trunk when officer told her to re-open the trunk and she complied after a brief hesitation); United States v. Wilson, 895 F.2d 168, 172 (4th Cir.1990) (defendant consented to search of his person by shrugging his shoulders and extending his arms); United States v. Zabala, 52 F.Supp.2d 377, 385 (S.D.N.Y. 1999) (defendant consented to search of her apartment when police asked her if "we can take a look inside" and defendant unlocked and opened her door); United States v. Lee, 1996 WL 391877, at *3-4 (S.D.N.Y. 1996) (defendant consented to search of shopping bag where she verbally refused to consent but handed the bag to the agent).

The defendants argue that the entry should be upheld under Takacs v. City of New York, 2011 U.S. Dist. LEXIS 7055 (S.D.N.Y. 2011) because it is undisputed that Ms. Briggs did not voice any lack of consent. There, however, the court addressed a different question. The court was determining whether an arresting officer's statement that he had consent to search a § 1983 plaintiff's apartment, when the plaintiff denied that he had consented, could establish sufficiently fraudulent circumstances as to overcome the presumption of probable cause created by a grand jury indictment. The court found that because the plaintiff did not allege that he voiced or otherwise manifested his lack of consent, plaintiff had not raised sufficient allegations to rebut the presumption. Id. at *13 n.6. In contrast, the plaintiff here does not have to rebut any presumption in his unlawful entry claim, but needs only to raise a triable question of fact on the issue of consent.

Ms. Briggs deposition states only that she turned her back and "let go" of her door. In some circumstances, this might have reasonably appeared to be a clear invitation for the officers to follow her. However, if the door were on a spring or otherwise closed when she let it go, it would be unreasonable to believe that she had in fact consented to the entry. Given that Ms. Briggs' affidavit characterizes her actions as "clos[ing]" the door, the Court must take this

evidence in the light most favorable to the plaintiff and conclude that, at the least, there is a genuine question of fact on the issue of consent.  Based on Ms. Briggs' statements in her deposition and affidavit, a reasonable jury could find that she attempted to close the door and fetch the plaintiff herself.

The defendants assert that even if consent was not in fact given, they are nonetheless entitled to qualified immunity on this claim.  As noted above, it is clearly established that an officer must reasonably believe he has adequate consent prior to making a warrantless entry into a home in circumstances such as these.  The only question is whether the defendants' actions here were objectively reasonable in light of these Fourth Amendment principles.  Similar to the qualified immunity analysis for the false arrest claim, supra, the Court concludes that there are still facts in dispute that are material to determining whether the defendants reasonably believed that consent had been obtained.  Since a jury could rationally conclude from the evidence presented that Ms. Briggs did not indicate any consent to the officers' entry, they could likewise conclude that the defendants were not objectively reasonable in concluding that the entry was lawful.  See Mangino v. Incorporated Village of Patchogue, 739 F. Supp. 2d 205, 243 n.33 (E.D.N.Y. 2010) (holding that "there are still disputed issues of fact regarding whether [the defendant] did consent and, if so, whether the consent was voluntary, that preclude summary judgment on the unlawful entry claim, including on the issue of qualified immunity").

Summary judgment is thus denied on the unlawful entry claim as to defendants Ruane and Franco.

## F.      Excessive Force

The defendants argue first that any non-handcuffing-related allegations of excessive force were not raised in the complaint and thus are separate claims that are now time-barred. The

defendants assert that the plaintiff did not make these additional allegations of force until his deposition.  Second, they argue that, even including any non-handcuffing-related allegations, the plaintiff has failed to present adequate evidence of injury to withstand summary judgment.

As an initial matter, even assuming that handcuffing-related excessive force and other types of excessive force can be properly viewed as distinct "claims," this Court rejects the defendants' contention that any non-handcuffing-related allegations are time-barred.  The complaint makes the clear factual allegation that the defendants "proceeded to arrest and detain plaintiff, and used excessive force to assault, detain, and imprison plaintiff."  (2d Am. Compl. ¶ 16.)  Under the heading for the excessive force cause of action, the complaint again states that the defendants "physically assault[ed]" the plaintiff.  (2d Am. Compl. ¶ 39.)  Coupled with what the defendants concede is a properly pleaded claim of excessively tight handcuffing, this is clearly sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)); see also Fed. R. Civ. P. 8(a)(2).  The defendants were on clear notice that the plaintiff was asserting a claim based on the amount of force used against his person during the arrest.  The Court believes that for the purposes of the statute of limitations, the statements made in the plaintiff's deposition are properly viewed as factual development and elaboration of his initial claim.

Civil rights claims under § 1983 for excessive use of force are governed by the "objective reasonableness" standard of the Fourth Amendment.  Graham v. Connor, 490 U.S. 386 (1989).  Whether the force used in connection with the arrest is reasonable depends on a careful weighing of the totality of the circumstances in each particular case, including whether the suspect poses a threat, resists, or attempts to evade arrest, and the severity of the crime at issue.  Id. at 396.  "Not

every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir.1973)).  Rather, a "de minimis use of force will rarely suffice to state a Constitutional claim." Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1991).

Plaintiff's deposition refers to the following incidents of force used during his arrest:  he states that the defendants subjected him to excessively tight and painful handcuffing, over his request that the handcuffs be loosened (Uzoh Decl, Ex. 4, at 141); that the officers shoved him into the police car, causing his head to hit the door frame (Id. at 221-22); that he was slammed against the wall multiple times (Id. at 219, 224); and that at the police precinct, one of the defendants bent him over a table and tightened his handcuffs until he signed an unidentified piece of paper (Id. at 191-94).

In terms of injury, the plaintiff states that as a result of the tight handcuffing he had sore wrists, red marks for "a whole month," and some degree of bleeding.  (Id. 225, 241.)  He states that hitting his head on the car door "hurt[] . . .Out of ten, nine," and that he began experiencing migraine headaches while incarcerated.  (Id. 222, 96.)  Finally, he states that he continues to experience pain in his wrists, though "only if [he] is playing sports."  (Id. 225.)

As for documented medical evidence, the record contains the following:  the prisoner medical treatment form completed on October 31, 2006 references a "complaint of arm pain" but makes no further diagnosis.  (Uzoh Decl., Ex. O.)  Medical records from Long Island College Hospital, made early in the morning of November 1, 2006, reference a "bruise to right arm", and state "17 y/o c/o pain to right arm and right side of forehead s/c assault on Thursday, pt hit in head and arm [by] 2x4 wood."  (Id.)  The "initial impression" of the hospital professional is listed as "contusions and abrasions" and on a later form, "soft tissue contusion to right arm,

abrasions right forehead."  However, based on the reference to the two-by-four, it is unclear

whether some or all of these injuries may have arisen from the assault that the plaintiff alleges to

have suffered by an unidentified individual prior to his arrest.  He admits to never mentioning

any wrist discomfort to the doctors, and nothing in the medical reports appears to reference any

wrist injury.  (Uzoh Decl., Ex. 4, at 240.)  Plaintiff testified in his deposition, however, that he

did not complain to the examining doctors of other injuries on the night of his arrest because he

remained scared of the police.  (Id. at 248-49.)  He also testified that he remained handcuffed

while at the hospital, which prevented the doctors from examining his wrists.  (Id. at 244.)

The defendants argue that the plaintiff fails to present sufficient evidence of injury

resulting from the arrest, and thus there is no question of fact that the force used was anything

other than de minimis.  The law of this circuit, however, does not appear to place a demanding

requirement on excessive force plaintiffs to demonstrate injury.  In Robison v. Via, 821 F.2d 913

(2d Cir. 1987), the Second Circuit held that the plaintiff's claims that she was pushed against the

inside of her car door, "yanked" out of her car by the police officer, and thrown up against the

fender of her car were sufficient to survive summary judgment.  Id. at 923-24.  Though the

plaintiff alleged only bruising, the court observed that

> [w]hile Robison did not seek medical treatment for her injuries, and this fact may
> ultimately weigh against her in the minds of the jury in assessing whether the
> force used was excessive, this failure is not fatal to her claim.  If the force used
> was unreasonable and excessive, the plaintiff may recover even if the injuries
> inflicted were not permanent or severe.

Id. at 924; see Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004) (citing Robison

and noting that "we have permitted a plaintiff's claim to survive summary judgment on

allegations that, during the course of arrest, a police officer twisted her arm, 'yanked' her, and

threw her up against a car, causing only bruising"); see also Hayes v. New York City Police

Dep't, 212 Fed. App'x 60, 62 (2d Cir. 2007) ("We have permitted claims to survive summary judgment where the only injury alleged is bruising.").  In Maxwell, the Second Circuit overturned the district court's grant of summary judgment to the defendants where the plaintiff alleged only that she scraped her head while being pushed inside the police vehicle.  380 F.3d at 109 -110.  There, however, the plaintiff did present medical documentation of post-concussive syndrome.  Id. at 108.  However, in Yang Feng Zhao v. City of New York, 656 F. Supp. 2d 375, 389-91 (S.D.N.Y. 2009), the district court refused to grant summary judgment where the plaintiff testified that the defendants pushed his face into a table causing him pain for about an hour, but he offered no record of medical treatment.  The court reasoned that while some district courts have required documentation of injury, "they have not specified the precise extent of the required injury or even indicated why the use of completely unjustified force by the police that does not result in physical harm could not yield a constitutional claim for which the appropriate relief would be nominal damages."  Id. at 390.

With respect to handcuffing-related uses of force, courts have analyzed the officers' conduct "in light of the minimal amount of force necessary to maintain custody of [the arrestee]." Esmont v. City of New York, 371 F. Supp. 2d 202, 215 (E.D.N.Y. 2005). In evaluating the reasonableness of police handcuffing, courts have looked at whether "1) the handcuffs were unreasonably tight; 2) the defendants ignored the arrestee's pleas that the handcuffs were too tight; and 3) the degree of injury to the wrists." Id. (citing Burchett v. Kiefer, 310 F.3d 937, 944-45 (6th Cir. 2002) (additional citation omitted)).  In Castro v. County of Nassau, 739 F.Supp.2d 153, 161 (E.D.N.Y. 2010), the court found that the plaintiff's deposition testimony that the defendants ignored his requests to loosen the handcuffs, leaving his wrists "red and sore," satisfied the injury element cited above.

In light of the facts and precedents, the Court concludes that summary judgment is inappropriate on this claim.  Crediting the allegations in the plaintiff's deposition, and recognizing the ambiguity as to the source of the injuries documented in the medical records, the Court cannot conclude as a matter of law that no rational trier of fact could find that the defendants used an unreasonable amount of force—particularly in light of the defendant's status as a minor at the time of the arrest and the lack of any evidence that he resisted or posed any other threat at that time.  A reasonable jury could credit the plaintiff's assertions that the defendants shoved him into the car door and the wall, intentionally tightened his handcuffs to cause him pain, and ignored his requests that the handcuffs be loosened.  The jury could likewise conclude that these uses of force resulted in some compensable harm.  The central inquiry for purposes of the Fourth Amendment is only whether the force used was <u>reasonable</u>, not whether it caused a particular degree of injury.  Ambiguity in the evidence of injury, and its bearing on the reasonableness question, are considerations to be weighed by a jury.

For similar reasons, the Court also concludes that qualified immunity is not properly decided at summary judgment for this claim.  As noted previously, the qualified immunity inquiry turns on whether the defendants' actions were objectively reasonable under clearly established law; and the clearly established law of excessive force itself hinges on the reasonableness of the force used.  <u>Stephenson v. Doe</u>, 332 F.3d 68, 77 (2d Cir. 2003) ("It is well established that 'the use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.'") (quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001)).  Since the degree and reasonableness of the officers' use of force against the plaintiff remains an issue of disputed fact, the Court likewise cannot conclude as a matter of law that the defendants' actions were reasonable for qualified immunity purposes.

For the foregoing reasons, summary judgment is denied as to the claim of excessive

against defendants Ruane and Franco.

## G.    Delayed Medical Treatment

The plaintiff claims that the defendants' failure to send him to the emergency room on

the night of his arrest violated his constitutional rights.  Claims of delayed medical treatment

made by a pre-trial detainee are decided under the rubric of the Due Process Clause, though the

analysis is essentially identical to a prisoner's Eighth Amendment claim for deliberate

indifference.  Caiozzo v. Koreman, 581 F.3d 63, 69-71(2d Cir. 2009); Weyant v. Okst, 101 F.3d

845, 856 (2d Cir. 1996).  A government custodian of a pretrial detainee "may be found liable for

violating the detainee's due process rights if the official denied treatment needed to remedy a

serious medical condition and did so because of his deliberate indifference to that need."  Id.  In

order to succeed on such a claim, the plaintiff must satisfy both objective and subjective

components: "Objectively, the alleged deprivation must be sufficiently serious, in the sense that a

condition of urgency, one that may produce death, degeneration, or extreme pain exists.

Subjectively, the charged official must act with a sufficiently culpable state of mind." Hathaway

v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996); see also Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d

Cir. 2000) (applying two-pronged test to pre-trial detainee).

In this case, the plaintiff cannot satisfy either prong.  As to the first factor, his own

admitted delay in seeking medical treatment for himself belies any claim of urgency or extreme

pain.  Felmine stated in his deposition that he was assaulted around 3:50 p.m. that afternoon.

(Uzoh Decl., Ex. 4, at 122-25.)  At the time of his arrest, at 11:30 p.m., he had made no attempt

to seek medical attention.  Moreover, as detailed earlier, the medical treatment form completed

on October 31, 2006 notes only a complaint of arm pain.  (Kunz Decl., Exhibit O.)  No rational

factfinder could conclude that he was presenting signs of urgent medical need in the preceding twenty-four hours that would satisfy the objective prong of a deliberate indifference claim. Moreover, Felmine admits that after being processed at Central Booking, the arresting officers drove him to the hospital in the early hours of November 1, 2006. (Uzoh Decl., Ex. 4, at 185-87.)

The plaintiff likewise fails to present any evidence regarding the subjective prong, which requires that the defendant actually "know[] of and disregard[] an excessive risk to . . health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); see Caiozzo, 581 F.3d at 71 (requiring that defendant be "actually aware of that immediate danger"). The uncontroverted facts reflect no excessive risk of which the defendants were aware, and further demonstrate that the defendants in fact provided medical treatment in a timely manner after the plaintiff's arrest was fully processed.

Summary judgment is therefore granted to the defendants on the claim of delayed medical treatment.

## H.    Conditions of Confinement

The plaintiff claims that he was subjected to unconstitutional conditions of confinement at the police precinct. Claims regarding inadequate conditions of confinement for pre-trial detainees are measured by "whether the conditions amount to 'punishment' without due process in violation of the Fourteenth Amendment." Lareau v. Manson, 651 F.2d 96, 102 (2d Cir.1981). As with claims of delayed medical treatment, these claims are analyzed under similar standards as Eighth Amendment claims brought by prisoners. Caiozzo, 581 F.3d at 70. Thus, the plaintiff must likewise establish both the objective and subjective components. First, the deprivation must, from an objective standpoint, be "sufficiently serious." Farmer v. Brennan, 511 U.S. 825, 34 (1994. A plaintiff must demonstrate that the conditions of confinement fell below the

"minimal civilized measure of life's necessities."  Rhodes v. Chapman, 452 U.S.337, 347 (1981);

see also Phelps v. Kapnolas, 308 F. 3d 180, 185 (2d Cir. 2002) ("Ultimately, to establish the

objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of

his confinement violated contemporary standards of decency."). The subjective test requires a

plaintiff to show that the defendant officials imposed the conditions with deliberate indifference

to a risk of harm of which they were subjectively aware. Caiozzo, 581 F.3d at 71.

Here, Felmine claims that he was deprived of water for several "hours" at the station, and

that he was kept overnight in a cold cell without a mattress for 6-7 hours.  (Uzoh Decl., Ex. 4, at

229-235.)  He also testified in his deposition that he did not eat until he got to Rikers Island,

which appears to have been sometime on November 1, 2006—around a day and a half after his

arrest.  (Id. at 189.)  During the preceding day, Felmine was taken to Central Booking, was

arraigned, met with a lawyer, and was taken to the hospital.  (Id. at 182-86.)  Felmine testified

that when he asked for food at the precinct, he was denied.  (Id. at 230).  He also testified,

however, that he did not tell anyone at Central Booking that he was hungry.  (Id.)  While he was

at the hospital, Felmine claims he was given water, but that the medical personnel stated they

weren't allowed to give him food because they couldn't face liability for food poisoning.  (Id. at

228-29.)

These allegations do not amount to punishment without due process. While the exact

sequence of events is unclear, Felmine's testimony establishes that after arriving at the precinct

late at night, he was shuttled between various places and custodians in order to process his arrest,

have him arraigned, and provide him with legal assistance and medical care.  Indeed, his

testimony indicates that for much of this time he was not even in the custody of the individual

defendants, but rather was being supervised by the Department of Corrections at Central

Booking or medical personnel at the hospital.   (Id. at 182-89.)  Furthermore, his own account indicates that much of the time he spent at the precinct was during the late evening hours.

In Rush v. Astacio, 1998 WL 480751 (2d. Cir. 1998), the Second Circuit held that, in the absence of evidence of an intent to punish, denying a pretrial detainee food for twelve hours and keeping him in a "very cold" room for six hours did not violate the plaintiff's due process rights. The court reasoned that "[n]either the degree of hardship nor the duration of the alleged constitutional violation were substantial."  Id. at *2; see also Benjamin v. Kooi, 2010 WL 985844, at *10 (N.D.N.Y. 2010) (denying plaintiff two to three meals and bedding for a full day did not violate Eighth Amendment).  The court further observed that "there are legitimate governmental purposes that justify not feeding every detainee upon arrival at a police station and that justify not accommodating every detainee's climate-sensitivities."  Rush, 1998 WL 480751, at *2; see Webster v. City of New York, 333 F. Supp. 2d 184, 200 (S.D.N.Y. 2004) ("There are legitimate governmental purposes that justify not feeding every detainee upon arrival at a police station, particularly those detainees who arrive at a police station in the early morning hours.").  The circumstances in this case appear sufficiently analogous.  In the initial bustle of processing and arraigning an arrestee, the government undoubtedly faces much higher difficulties in accommodating hunger and sleeping requests than in a static prison environment.  Even crediting the plaintiff's testimony, the oversight alleged here is not sufficiently serious to amount to a constitutional violation, and does not demonstrate that the defendants consciously disregarded an "excessive risk to [the plaintiff's] health or safety."  Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir.1994).

Summary judgment is thus granted to the defendants on this claim.

I.      **Illegal Strip Searches**

The plaintiff's complaint cursorily alleges that he was strip searched repeatedly while incarcerated at Rikers. (2d Am. Compl. ¶ 53-59.)  He fails, however, to point to evidence anywhere in the record supporting this claim, or any evidence that the individual defendants conducted the alleged strip searches.  Summary judgment in favor of the defendants is properly granted on any such claim.

## J.  Substantive Due Process

The plaintiff also appears to assert a catch-all substantive due process claim.  However, he presents no facts or case law indicating that this claim should be analyzed separately from the more specific constitutional violations alleged above; indeed, the one case he cites dismissed a catch-all due process claim for precisely these reasons.  Zahrey v. City of New York, 2009 WL 54495, at *25 (S.D.N.Y. 2009).  The Supreme Court has held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." County of Sacramento v. Lewis, 523 U.S. 833, 842 (1998) (internal quotation marks omitted).

Accordingly, summary judgment is granted to the defendants on any residual due process claim.

## K.  Conspiracy under 42 U.S.C. § 1985

Plaintiff also asserts a claim for conspiracy under 42 U.S.C. § 1985(3).  For such a claim to survive, the plaintiff must present evidence of "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the

conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790 (2d Cir. 2007).  In addition, the plaintiff must show that the alleged conspiracy was "motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir.1999) (internal quotation marks omitted).  Mere conclusory allegations that a conspiracy took place, without any factual basis evidencing a "meeting of the minds" between the defendants, will warrant dismissal of a § 1985 claim.  Webb v. Goord, 340 F.3d 105, 110-11 (2d Cir. 2003).

In this case, the plaintiff is unable to make out a claim of conspiracy that can withstand summary judgment.  He presents no evidence of an agreement involving any of the defendants, and makes only conclusory and generalized allegations that the defendants conspired with a "Ms. Moke" and the safety officer at Clara Barton High School to "present false testimony" against the plaintiff.  Who Ms. Moke is and her relation to the case are found nowhere in the record.  As to the safety officer, a police report in the record indicates only that he was interviewed by the defendants and stated that Felmine was a part of an incident involving a Haitian flag, a fact that Felmine concedes.  (Kunz Decl, Ex. D.)  None of the defendants other than Ruane were deposed, and Ruane's deposition does not support the existence of any conspiracy to deprive the plaintiff of equal protection under the laws.  Moreover, plaintiff's only evidence of discriminatory animus is the assertion in his brief that he is of West Indian descent.

These sparse facts do not provide any credible basis for the finding of a §1985 conspiracy.  Summary judgment is thus properly granted to the defendants on this claim.


## IV.    MONELL CLAIM AGAINST THE CITY OF NEW YORK

The plaintiff's allegations against the City of New York fail to satisfy the requirements of Monell v. New York City Dep't of Social Servs., 436 U.S. 658 (1978).  In order to sustain a claim for relief under 42 U.S.C. § 1983 against a municipal defendant, a plaintiff must show the existence of an officially adopted policy or custom that caused injury, and a direct causal connection between that policy or custom and the deprivation of a constitutional right.  Bd. of County Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under Monell, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which can be attributed to a municipal policymaker."  City of Oklahoma v. Turtle, 471 U.S. 808, 823-24 (1985).  Said another way, the plaintiff must demonstrate that the municipality was the "moving force" behind the alleged injury.  Brown, 520 U.S. at 404.

In this case, the plaintiff makes only conclusory assertions of Monell liability based on the City's alleged failure to train Detective Ruane and ADA Alexander; an alleged city policy of arresting innocent persons in order to meet "productivity goals"; an alleged policy of unconstitutionally strip searching prisoners at Riker's island; and an alleged policy of filing statements of readiness for trial in cases where the prosecutor was informed by her witnesses that they did not want to be involved in the prosecution.

There is no evidence in the record supporting any of the plaintiff's policy allegations.  As to Ruane's alleged lack of training, the plaintiff can point only to a vague question asked during Ruane's deposition on whether he was trained at the Police Academy "on the kind of questioning" to ask crime witnesses, to which he responded, "Not that I can recall." (Uzoh Decl., Ex. 6, at 82.)  There is no evidence of the City's alleged failure to train ADA Alexander or of any policy of when statements of readiness are to be filed.  As to any alleged policies of strip

41

searching prisoners or making arrests to meet productivity goals, plaintiff cites only to his own complaint and to an unproduced statement by Deputy Commissioner Paul J. Browne from 2006. (Pl. 56.1 Stmt. ¶¶ 159-60.)

Summary judgment is thus granted to the City of New York on plaintiff's § 1983 claims.

## V.      STATE LAW CLAIMS

Plaintiff also alleges various claims against all the defendants under New York state law that can be disposed of summarily.[6]

In New York, the statute of limitations for tort actions against the city or its employees is one year and ninety days.  N.Y. Gen. Mun. L. §§ 50-k, -i.  As noted earlier, the limitations period was tolled due to plaintiff's infancy until December 9, 2006.  Thus, any claims accruing during the plaintiff's initial arrest and detention expired on or around March 9, 2008—well before the original complaint was filed on August 31, 2009.  The only claim for which the limitations period had not yet run, as the defendants concede, was the state law claim for malicious prosecution, which did not accrue until the favorable termination of proceedings on June 9, 2009. See Nunez v. City of New York, 307 A.D.2d 218, 219 (1st Dep't, 2003).  Similarly, since the plaintiff concedes that he did not file a notice of claim with the City until August 28, 2009, he failed to comply with New York's notice of claim requirement for all claims other than malicious prosecution.  See N.Y. Gen. Mun. L. §§ 50-e, -i, -k(6) (requiring plaintiffs suing municipal defendants or police officers to file a notice of claim within 90 days following the incident).

---

[6] Though the complaint is not entirely clear, the state law claims appear to be for false arrest, excessive force, and malicious prosecution; constitutional tort claims under the state constitution; claims for intentional and negligent infliction of emotional distress; and a claim against the City for negligent hiring.

As previously noted, the requirements for a malicious prosecution claim under New York state law are essentially the same as those required under federal law.  Cornejo v. Bell, 592 F.3d 121, 129 (2d Cir. 2010) ("[S]ection 1983 . . . adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned."); see also Broughton v. State, 37 N.Y.2d 451, 457 (N.Y. 1975).  Therefore, since the Court has already found summary judgment in favor of the defendants to be proper on the federal malicious prosecution claim, summary judgment on the state analogue is likewise granted here.

## VI.    CONCLUSION

For the foregoing reasons, summary judgment on the claims against defendants Ruane and Franco for false arrest, unlawful entry, and excessive force is DENIED.  As to all the remaining claims and defendants, the defendants' motion for summary judgment is GRANTED.

## THE PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

The plaintiff seeks to amend his complaint principally to add multiple claims against ADA Allana Alexander.  These claims include (1) violation of the right to a fair trial; (2) violation of substantive due process rights; (3) selective enforcement; (4) conspiracy; and (5) malicious prosecution.  The plaintiff now also asserts selective enforcement claims against the police officer defendants.  The defendants argue that the amendment adding ADA Alexander should be disallowed because it is "futile," owing either to absolute or qualified immunity.  They further argue that the selective enforcement claim fails as a matter of law.[7]

Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a pleading "shall be freely given where justice so requires."  However, where "there is no merit in the proposed amendments, leave to amend should be denied."  Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990); see Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993) (per curiam) ("Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend.").  A proposed amendment is futile if it could not withstand a motion to dismiss.  Lucente v. Int'l Business Machine's Corp., 310 F.3d 243, 258 (2d. Cir. 2003).[8]

As detailed below, the motion to amend the complaint is denied in full.  The Court agrees that the claims against ADA Alexander are futile as a matter of law, because her actions were protected by either absolute or qualified immunity.  Further, the Court finds that there are no

---

[7] Defendants, in their response, appear to have neglected to address the selective enforcement claim as to the police officer defendants specifically, but they do present an applicable argument that such a claim fails as a matter of law in their discussion of ADA Alexander.

[8] Though the standard for futility has been formulated based on a motion to dismiss, where the motion to amend is made after discovery, courts have looked to the record in assessing whether the proposed amendment is futile.  See, e.g., Lucente, 310 F.3d at 259-60; Lee v. Regal Cruises, Ltd, 916 F. Supp. 300, 304-05 (S.D.N.Y. 1996).  The Court is thus not limited to the pleadings in its assessment.

facts in the proposed amended complaint or the record supporting a selective enforcement claim

against any defendant, thus the selective enforcement claim against the remaining defendants is

likewise disallowed.

## I.   RELEVANT FACTS

All of the plaintiff's claims against ADA Alexander arise out of the following facts,

which the Court recounts here in the light most favorable to the plaintiff.  ADA Alexander did

not get involved in the case against Ian Felmine until after he had been arrested and the felony

complaint had been filed.[9]  Her duties upon receiving the case were to prepare an indictment and

present the case to the grand jury.  (Uzoh Decl., Ex. 7, at 16-18.)  Both parties agree that

Alexander came to the hospital to take the video testimony of Max Mazile, and that while at the

hospital she also spoke to some of Mazile's friends, concerning their knowledge of the stabbing

incident.  As a result of these conversations at the hospital, Alexander asked Wilguens Dorval, a

witness to the fights outside the Brooklyn Museum who had not previously been identified by

the police, to testify before the grand jury.  (Id. at 21, 31-33, 62.)  Alexander testified in her

deposition that she believes she interviewed Dorval prior to taking Mazile's video testimony.

(Id. at 35.)

According to Dorval's deposition, his encounter with ADA Alexander began when she

came up to a group of Mazile's friends who were visiting the hospital and asked them if they had

any information about what had taken place.  (Uzoh Decl., Ex. 9, at 38-39.)  Dorval testified that

Alexander told the group that she needed evidence to "lock up" Felmine, who she told them had

---

[9] Different personnel at the DA's Early Case Assessment Bureau were responsible for the initial interview of
Detective Ruane, the drafting of the felony complaint, and the first arraignment and bail hearing (where a date was
set for the grand jury).  After that point the case was assigned to ADA Alexander for presentation to the grand jury
in order to secure the felony indictment.  (Uzoh Decl., Ex. 7, at 13-17.)

already been arrested.  (Id. at 39.)  In a sworn affidavit, Dorval elaborated that the ADA made "an emotional speech" stating that she was convinced Felmine was the perpetrator, and that he was violent and shouldn't be left on the streets.  (Uzoh Decl., Ex. 34, at ¶ 12.)  According to Dorval, she asked the group to imagine how they would feel if Felmine were released and ended up attacking them or their loved ones.  (Id.)

During ADA Alexander's conversation with the group, Dorval testified that one or more people (not including himself) stated that they had seen Felmine with a screwdriver.  (Uzoh Decl., Ex. 9, at 43, 52.)  Dorval testified that Alexander then took him aside for a one-on-one conversation where she asked him if he would testify before the grand jury.  (Id. at 43, 44.)  According to Dorval, he told Alexander during that conversation that he did not know who stabbed Mazile.  (Id. at 42.)  He told her that he saw Felmine "fighting" in the group of people, and that Felmine had one hand inside his shirt, but that didn't see him holding any weapon.  (Id. at 47-48.)  Dorval testified that during this conversation, ADA Alexander did not tell him what he should say before the grand jury.  (Id. at 49.)

Dorval testified that the next conversation he had with Alexander was at the courthouse, immediately prior to his grand jury testimony.  (Id. at 51.)  During this conversation, Dorval claims Alexander asked him again if he saw Felmine with a screwdriver, and Dorval told her "If people who were there said they saw Ian with a screwdriver, then maybe he had a screwdriver." (Id. at 53.)  Dorval claims that Alexander's response was, "Then that is what you should use." (Id.)  In Dorval's grand jury testimony, he testified unequivocally that he personally observed Felmine chase Mazile, pull out a screwdriver, swing it at Mazile, and then participate in kicking and punching Mazile.  (Kunz Decl., Ex. N. at 12-13.)  After hearing Dorval's testimony and the

video of Mazile's testimony, the grand jury returned a true bill against Felmine for attempted murder and other counts.  (Kunz Decl., Ex. H.)

## II.      ADA ALEXANDER:  ABSOLUTE AND QUALIFIED IMMUNITY

The law is well established that prosecutors are entitled to absolute immunity "from claims for damages arising out of prosecutor duties that are 'intimately associated with the judicial phase of the criminal process.'"  Parkinson v. Cozzolino, 238 F.3d 145, (2001) (2d. Cir. 2001) (quoting Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996)).  In determining whether a prosecutor is entitled to absolute immunity, courts employ a functional approach, which looks to the nature of the function that the prosecutor was performing at the time of the complained of actions.  Buckley v. Fitzsimmons, 509 U.S. 259, 269 (1993).  If counsel was acting in her role as an advocate, she is entitled to absolute immunity.  Imbler v. Pachtman, 424 U.S. 409, 430 (1976).  Functions that serve "in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of [a prosecutor's] role as an advocate for the State" are unquestionably entitled to absolute immunity.  Buckley, 509 U.S. at 273.  On the other hand, if she was acting in an investigatory capacity, she is entitled only to the qualified immunity that is normally given to executive officials pursuing their duties.  Id. (observing that qualified immunity is the norm for executive officers.)  The government bears the burden of establishing absolute immunity, but once a court determines that the prosecutor was functioning in her capacity as an advocate, absolute immunity will shield her from liability "however erroneous the act may have been, and however injurious in its consequences it may have proved to be to the plaintiff."  Cleavinger v. Saxner, 474 U.S. 193, 199-200 (1985); see DiBlasio v. Novello, 344 F.3d 292, 297 (2d Cir. 2003).

Drawing the line between prosecutorial and investigative functions is rarely easy.  Courts have often looked to "the timing of the conduct at issue."  DiBlasio, 344 F.3d at 300-01.  Thus, Buckley held that a prosecutor was not functioning as an advocate "before he had probable cause to have anyone arrested."  Buckley, 509 U.S. at 273; see Hill v. City of New York, 45 F.3d 653, 661 (2d Cir.1995) ("Before any formal legal proceeding has begun and before there is probable cause to arrest . . . a prosecutor receives only qualified immunity.") (citations omitted).  The Supreme Court stated that the critical distinction lies "between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial" and "the detective's role in searching for the clues and corroboration that might give him probable cause."  Buckley, 509 U.S. at 273.  However, "[a]ll members of the Court [in Buckley] recognized . . . that a prosecutor's conduct even after probable cause exists might be investigative."  Zahrey v. Coffey, 221 F.3d 342, 347 n.2 (2d Cir. 2000).

In this case, the primary conduct complained of took place in the time period after the felony complaint had been filed, and led up to ADA Alexander's presentation to the grand jury.  The plaintiff's central allegation against Alexander is that she "knowingly suborned perjury, and coerced and manipulated witnesses into providing false testimony against the plaintiff" at the grand jury.  (3d Am. Compl. at ¶ 20.)

"There is widespread agreement among Courts of Appeals that prosecutors are absolutely immune from liability under § 1983 for their conduct before grand juries."  Burns v. Reed, 500 U.S. 478, 490 n.6 (1991).  It has been squarely held that the act of "knowingly presenting false evidence to, while at the same time withholding exculpatory evidence from [the grand jury] . . . lie[s] at the very core of a prosecutor's role as an advocate."  Bernard v. Cnty. of Suffolk, 356 F.3d 495, 503 (2d. Cir. 2004); see Imbler, 424 U.S. at 431 & n.34 (holding prosecutor is

absolutely immune from liability for initiating a prosecution and from claims that he willfully

used perjured testimony).  The prosecutor's absolute immunity applies "not just for presentation

of testimony" but also to preparatory conduct "relating to their advocacy."  Dory v. Ryan, 24

F.3d 81, 83 (2d Cir. 1994) (holding prosecutor absolutely immune from claim of conspiring to

present false evidence at a criminal trial).  The Second Circuit has recognized, for example, that

"out-of-court efforts to control a witness' grand jury testimony that are made subsequent to the

decision to indict" are protected by absolute immunity.  Hill v. City of New York, 45 F.3d 653,

662 (2d Cir. 1995).  It is critical to bear in mind, however, that once an indictment has issued, it

is all too easy to classify every action taken by the prosecutor prior to that moment as an

advocate's preparation.  Nonetheless, where a prosecutor undertakes "investigative functions

normally performed by a detective or a police officer," only qualified immunity will attach.

Buckley, 509 U.S. at 273; see Smith v. Garretto, 147 F.3d 91, 94 (2d Cir. 1998) ("[The

defendant's] action in orchestrating a sting  . . . is decidedly on the investigation side of the line.

In no sense was [he] preparing for the presentation of an existing case; he was doing police work

in the hope that his target would succumb to temptation and thereby furnish evidence on which a

prosecution could be based.")

        In light of the above, it seems clear that the actions taken by ADA Alexander in her

courthouse meeting with Wilguens Dorval, immediately prior to his testimony before the grand

jury, fell squarely within her role as an advocate.  At this point, not only had the felony

complaint been filed and the suspect arrested, but the decision to seek an indictment had already

been decidedly made—indeed, the presentation to the grand jury was to take place in mere

minutes.  Alexander was preparing Dorval's testimony, and such conduct is properly

characterized as part of an advocate's function of presenting evidence on behalf of the state.  See

Buckley, 509 U.S. at 273 (absolute immunity extends to "the professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made").  Although, taking the plaintiff's version of the events as true, Alexander may have prepared a witness to testify to facts for which he lacked personal knowledge, this seems no less entitled to absolute immunity than the knowing presentation of false evidence that has been held in prior cases to fall within the prosecutorial function.  See Imbler, 424 U.S. at 431 & n.34; Bernard, 356 F.3d at 503.  Once ADA Alexander arrived at the courthouse to prepare an already scheduled witness to testify before the grand jury, she was initiating a prosecution as an advocate for the state, and was therefore covered by absolute immunity.

In light of the foregoing conclusion, the only remaining question as to ADA Alexander is whether the plaintiff may properly amend claims arising out her conduct during her visit to the hospital.[10]  In that setting, crediting the plaintiff's version of the facts, one could plausibly conclude that ADA Alexander was acting as an investigator rather than an advocate.  First, as to the timing, it is true that the criminal court complaint had already been filed and a grand jury presentation had been scheduled.  However, the complaint was filed only a few days previously, and a factfinder could conclude that ADA Alexander was still in the process of compiling evidence and determining whether an indictment could in fact be obtained on the available testimony.  As for other functional considerations, Alexander admitted that the witnesses interviewed had not previously been identified by the police, and that she was the only person who discovered Wilguens Dorval.  In speaking to the group of Mazile's friends, Alexander was not verifying information from a witness already interviewed by the police, but was in fact

---

[10] To the extent that plaintiff attempts to attach any liability to ADA Alexander's filing of a statement of readiness for trial, (3d Am. Compl. at ¶ 26), it need only be noted briefly that such conduct falls clearly within a prosecutor's function as an advocate before the trial court.

investigating whether other eyewitnesses could corroborate and bolster Mazile's account of the events.  It would be reasonable to conclude that this conduct was the sort of "investigative function[] normally performed by a detective or a police officer." <u>Buckley</u>, 509 U.S. at 273

Nonetheless, we need not decide the question for certain because any claims arising out of these events, if actionable at all, would be entitled to qualified immunity.  As noted previously, "public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." <u>Holcomb v. Lykens</u>, 337 F.3d 217, 220 (2d Cir. 2003) (quoting <u>Weyant v. Okst</u>, 101 F.3d 845, 857 (2d Cir. 1996)).  The plaintiff argues repeatedly that Alexander's conduct at the hospital amounted to "solicit[ing], coerc[ing], and manipulate[ing]" Dorval into providing false testimony, as well as "conspir[ing] to fabricate" false evidence.  (Pl. Br. at 21-22.)  However, the only evidence in the record is that Alexander spoke to a group of Mazile's friends, told them Felmine had been arrested, and asked someone to step forward to testify.  There is absolutely no indication that she threatened or coerced them. Even taking as true Dorval's affidavit, which contains the firmest allegations (though is not fully corroborated by Dorval's own deposition), ADA Alexander merely urged the group to help her put a violent offender in jail, and to imagine how they would feel if someone they knew were harmed by him in the future.  Further, the affidavit states that when talking to Dorval's alone, Alexander informed him only that she "needed . . . damaging testimony."  (Uzoh Decl., Ex. 34, at ¶ 18.)  Dorval stated in his deposition that at no time during her visit to the hospital did Alexander tell him how he should testify.  Further, he admitted that when Alexander spoke to the whole group, she was provided with the information that Felmine was seen with a screwdriver,

and that he himself told her that he saw Felmine participating in the fight at the Brooklyn Museum.

None of these facts give rise to any credible inference of a constitutional violation. Appealing to a group's better instincts in order to encourage them to testify is not actionable conduct.  Furthermore, Dorval's account of his private conversation with ADA Alexander demonstrates only that she told him she was seeking information, asked him questions, listened to his answers, and that he subsequently agreed to testify before the grand jury.  There is no evidence that Alexander abused any investigatory function in order to secure particular testimony.  For that reason, "[n]o reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable" under any claim or theory drawn from established law.  Ford v. Moore, 237 F.3d 156, 162 (2d Cir.2001).

For the reasons stated, the Court concludes that the proposed amendment adding claims against ADA Alexander would be futile, because all of the conduct at issue was protected by either absolute or qualified immunity.


## III.    SELECTIVE ENFORCEMENT

The plaintiff now seeks to add a claim of selective enforcement against all the defendants.  This claim plainly could not survive a motion to dismiss.  "In order to establish a violation of equal protection based on selective enforcement, the plaintiff must ordinarily show "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure

a person." Lisa's Party City, Inc. v. Town of Henrietta, 185 F.3d 12, 16 (2d Cir. 1999) (internal quotation marks omitted).

The proposed amended complaint offers no factual basis for this claim other than the fact that Felmine happens to be West Indian. (3d Am. Compl. at ¶ 31.) In his motion papers, the plaintiff's only supplemental argument is that he was the only person arrested for the stabbing of Mazile. Clearly, these conclusory statements do not state a valid claim for selective enforcement.

## IV. CONCLUSION

For the reasons stated, the plaintiff's motion to file a third amended complaint and to join ADA Allana Alexander as a defendant is DENIED in full, because any new claims would be futile.

SO ORDERED.

Dated: Brooklyn, New York
September 29, 2011

/s/
Carol Bagley Amon
Chief United States District Judge